**MOUNT VERNON CONTRACTING CORPORATION, Louis G. De Felice and Domenic V. Frione, Copartners Doing Business Under the Firm Name and Style of D. & F. Construction Company, The L. C. L. Corporation and the Windsor Building Supplies Co., Inc.,**

v.

**The UNITED STATES.**

**No. 49110.**

United States Court of Claims.

July 12, 1957.

John B. Gilleran, White Plains, N. Y., for plaintiffs Mount Vernon Contracting Corp. and Louis G. DeFelice and Domenic V. Frione, Cribari, Icapilto & Salinger, Mt. Vernon, N. Y., and John B. Gilleran, White Plains, N. Y., were on the brief.

William H. Coogan, New York City, for plaintiffs L. C. L. Corporation and The Windsor Building Supplies Co., Inc., Sullivan, Donovan, Hanrahan, McGovern & Lane, New York City, on the brief.

William A. Stern, II, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

This is a suit for damages for alleged breach of contract, brought by Mount Vernon, which had a contract with the United States, D and F, which had a subcontract with Mount Vernon, and L. C. L. and Windsor which had subcontracts with D and F. Since the plaintiffs other than Mount Vernon were not in contractual relation with the United States, none except Mount Vernon is eligible to bring this suit. Since, however, a prime contractor may, in proper circumstances, bring suit for the use and benefit of his subcontractors, we will treat this suit as such a suit by Mount Vernon.

Mount Vernon in March 1943 made a contract with the Government, which acted through the Army Corps of Engineers, to pave and drain a landing field

at Newburgh, New York. The general grading of the field had been done during the previous year under other contracts. Under Mount Vernon's contract there was excavation and grading to be done, new runways and extensions of existing runways to be paved, and drainage to be constructed.

Mount Vernon subcontracted practically all the work. The subcontractors for excavation and for hauling and placing of gravel fill are not involved in the instant suit. Mount Vernon subcontracted the paving to D and F at unit prices per square yard of pavement and per barrel of cement. The subcontractors for excavation and for the placing of gravel were to prepare the base, within one inch tolerance, to receive the paving.

The excavation was, according to Mount Vernon's contract, to be sufficiently deep to place a six- or eight-inch gravel fill subbase, in areas where the general grading of the previous year had made a cut, and a 12-inch gravel fill subbase where there had been a fill. That type of excavation was designated as Class A. Class B excavation was to be done where excavation to the Class A depths did not, under tests to be performed by the contracting officer, provide a sufficiently solid subbase. In such cases the contracting officer might direct deeper excavation.

As the work progressed, the soil was found to be very unstable in many places. The unstable areas ranged from small spots five or six feet across to areas 50 to 100 feet wide, 500 to 600 feet long, and as much as 15 feet deep. When the unstable material was removed, it was found to be unsuitable for fill, because much of it was hard clay and large rocks. At a conference between Mount Vernon and the Government's resident engineer, it was agreed that such materials would be removed to spoil areas at an agreed increased price, and the excavated space would be filled with gravel at the contract unit price. It was hard to find sources for the enormously increased amounts of gravel. At one time the gravel contractor had 100 trucks engaged in hauling gravel.

The approved progress schedule showing the periods and sequence of the work, and a concrete paving chart were furnished D and F by Mount Vernon. The schedule provided for paving to be commenced May 14, 1943 and completed August 11, 1943. D and F erected its storage bins and batching plants, placed orders for crushed stone, sand and cement, and brought some equipment to the job, by May 14. Delivery of cement was commenced on June 3 and paving was commenced on June 8, when, for the first time, an area was ready for paving.

Because of the additional excavation and gravel fill work referred to above, no paving area sufficient for normal paving operations was ready until about September, 1943. The gravel subcontractor who was supposed to bring the base course to within one inch of the specified grade was careless about his grade and left large stones in the gravel. Extra work for D and F, disputes, and some delay in the paving operation resulted. Because adequate areas were not prepared in advance, D and F had to make frequent moves of its operations. On many occasions after the excavation had been done and gravel fill placed, additional soft spots would be discovered and further excavation made. Frequently D and F would have performed its finished grading, placed forms, and commenced paving when additional soft spots would be discovered and everything would have to be torn out.

On October 14, 1943, after all excavation had been done and most of the gravel had been placed on one of the taxiways, and it was substantially ready for paving, the Government determined to swing one end around several hundred feet from its original position. As realigned, it was not ready for paving until November 18.

D and F completed all of its paving about November 27, 1943, some 87 days later than it could have completed it if

it had been able to proceed continuously. Some of this delay was due to a strike, and some was due to Mount Vernon's failure to supervise and coordinate the work of its subcontractors, and to the failure of the gravel subcontractor to properly prepare the gravel base. Some sixty days of delay was, however, caused to D and F by stop orders and changes in the contract work, ordered by the Government, and resulting in delay in the preparation of areas for paving.

After the completion of the contract, the excavation subcontractor sued Mount Vernon because it had been required, by a change in the specifications agreed to between the Government and Mount Vernon, to waste the Class B excavation in the spoil area rather than use it as embankment fill. The court awarded an increased unit price per yard, which amounted to some $90,000, and Mount Vernon paid this amount. Thereupon, in April 1955, Mount Vernon requested an adjustment in the Class B excavation provisions in its prime contract. Modification No. 17 was issued on May 25, 1945, reclassifying a large part of the Class B excavation as Class C, and increasing the unit price per yard, the increase amounting in all to $49,596.82. There were other increases in Modification No. 17 not relevant here. Modification No. 17 was accepted in writing by Mount Vernon.

The delay of D and F's paving work was, naturally, damaging to it. Its machinery was tied up on the job, its overhead and fixed charges went on for a longer period, and its efficiency was impaired. We have, then, a situation in which the prime contract, in Article 3, reserves to the Government the right to make changes in the work, within the general scope of the contract, and obligate the Government, if the changes cause an increase or decrease in the amount due under the contract, or in the time required for its performance, to make an equitable adjustment in the price and time. It further reserves the right, Specifications 1–05(c) (1), to stop the work when conditions are determined to be unfavorable to its prosecution.

The Government makes changes in the amount and method of work with regard to excavation and the placing of gravel. The changes are necessary to make a safe landing field, but they delay the completion of the excavation and gravel work, and consequently delay D and F's paving work. The Government pays the prime contractor for the increased yardage involved in the changes, and for the increased difficulty of the work done by the changed method. D and F still has the original number of yards of pavement to place and is paid the unit price for doing it. Its work has not been increased. It has only been delayed, to its damage. The stop orders did not change or increase anyone's work. They only delayed it. We do not understand that either the change orders or the stop orders were unreasonable.

The Government relies upon United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53, and we think its reliance is justified. Rice was the receiver for a plumbing contractor, whom we will call P. P had a prime contract for the plumbing, heating, and electrical work for a veterans' home which the Government was having built. Another contractor had a prime contract for preparing the site and constructing the building. The Government notified both contractors to begin work. Unsuitable soil conditions were discovered, the site of the building, and the specifications, had to be changed. P was not able to begin work until many months later than he had contemplated, and was damaged by the delay. P was paid the contract price for the work, and sued in this court for the damage caused by the delay. This court gave him a judgment. (95 Ct.Cl. 84.) The Supreme Court reversed. It held that the exercise of the Government's contract right to make changes could not amount to a breach of contract, and that the contractor was given, by the contract, only the right to have the contract price adjusted in accordance with the change in

the work, and to have additional time, if that was made necessary by the changed work.

D and F, as a subcontractor, is in no different position from what it would have been in as a separate prime contractor, as P was in Rice, or as Mount Vernon would have been in if it had done the paving work itself instead of subcontracting it to D and F.

We have limited our discussion to the situation of D and F. L. C. L. and Windsor, being subcontractors of D and F, are in no better position than D and F.

In view of our conclusion as to the legal merits of the claims presented in the petition, we do not consider or decide what was the effect of the release given to Mount Vernon by D and F, L. C. L., and Windsor.

The petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.